CEMEX, S.A., Plaintiff–
Cross Appellant,

v.

UNITED STATES, Defendant–Appellee,

and

The Ad Hoc Committee of AZ–NM–TX–
FL Producers of Gray Portland Ce-
ment and National Cement Company
of California, Defendants–Appellants.

Nos. 04–1058, 04–1080.

United States Court of Appeals,
Federal Circuit.

DECIDED: Sept. 28, 2004.

Irwin P. Altschuler, Greenberg Traurig, LLP, of Washington, DC, argued for plaintiff-cross appellant. With him on the brief was Jeffrey S. Neeley. Of counsel was David R. Amerine, Manatt, Phelps & Phillips, LLP, of Washington, DC.

David S. Silverbrand, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; and Jeanne E. Davidson, Deputy Director. Of counsel on the brief was Edward N. Maurer, Deputy Assistant Chief Counsel, International Trade Litigation, Bureau of Customs and Border Protection, Department of Homeland Security, of New York, NY.

Jeffrey M. Telep, King & Spalding LLP, of Washington, DC, argued for defendants-appellants. With him on the brief were Joseph W. Dorn and Michael P. Mabile.

Before NEWMAN, MICHEL, and RADER, Circuit Judges.

MICHEL, Circuit Judge.

Ad Hoc Committee of AZ–NM–TX–FL Producers of Gray Portland Cement and National Cement Company of California (collectively, "Ad Hoc") appeal the decision of the United States Court of International Trade denying its motion to enforce the judgment entered against Cemex, S.A. ("Cemex"), a Mexican importer of gray portland cement, in *Cemex, S.A. v. United States*, 20 CIT 1272 (1996), *aff'd* 133 F.3d 897 (Fed.Cir.1998) ("*Cemex I*"). In that case, Ad Hoc successfully obtained an increase in the amount of antidumping duties calculated by the Department of Commerce ("Commerce") for the second administrative review period, August 1, 1991 to July 31, 1992, from 42.74 percent *ad valorem* to 106.846 percent *ad valorem*. Despite Ad Hoc's successful challenge, affirmed by this court, some 140 entries subject to the higher duty were deemed liquidated at the Port of Nogales, Arizona, "as entered" at the cash deposit rate of 56.94 percent *ad valorem* rather than the final assessment rate of 106.846 percent *ad valorem*.

In denying Ad Hoc's motion, the Court of International Trade concluded that while none of those 140 entries were properly deemed liquidated under 19 U.S.C. § 1504(d), the United States Customs Service's ("Customs")[1] subsequent decision to acknowledge the deemed liquidation by posting a bulletin notice at the Port of Nogales became "final and conclusive upon all persons" under 19 U.S.C. § 1514(a), barring Ad Hoc's claim. *Cemex, S.A. v. United States*, 279 F.Supp.2d 1357 (Ct. Int'l Trade 2003) ("*Cemex II*").

Ad Hoc agrees with the trial court that none of the subject entries were properly deemed liquidated under 19 U.S.C. § 1504(d), yet seeks to reverse the court's holding that the finality provisions of 19 U.S.C. § 1514(a) preclude all challenges to Customs' subsequent decision to recognize the entries as liquidated. Cemex cross-appeals, claiming the Court of Internation-

---

1. The United States Customs Service is now known as the Bureau of Customs and Border Patrol of the Department of Homeland Security.

al Trade erred in determining that no deemed liquidation had occurred. Because we agree with the Court of International Trade that 19 U.S.C. § 1514(a) rendered Customs'—albeit erroneous—decision to acknowledge the deemed liquidations "final and conclusive upon all persons," we affirm the denial of Ad Hoc's motion.

## I. BACKGROUND

Between August 1, 1991 and July 31, 1992, Sunbelt Cement, Inc. entered gray portland cement produced by Cemex and Cementos de Chihuahua from Mexico into the United States through the Ports of Nogales, Arizona; Los Angeles, California; San Diego, California; and El Paso, Texas. These entries were covered by an antidumping duty order on gray portland cement from Mexico at the rate of 56.94 percent *ad valorem* in effect during the second administrative review period. *Gray Portland Cement And Clinker From Mexico*, 55 Fed.Reg. 35443 (1990). After Commerce concluded the second administrative review, setting a final dumping margin of 42.74 percent *ad valorem* for the August 1, 1991 to July 31, 1992 entries ("Second Review Entries"), Ad Hoc brought an action challenging certain aspects of Commerce's final results. The Court of International Trade consolidated Ad Hoc's action with a suit contesting the results of the second administrative review filed by Cemex and, on October 6, 1993, enjoined liquidation of the Second Review Entries under 19 U.S.C. § 1516a(c)(2) pending resolution of the consolidated action.

Following two remands to Commerce, the Court of International Trade issued its final judgment on October 24, 1996, sustaining the 109.43 percent *ad valorem* dumping margin for the Second Review Entries calculated by Commerce during the second remand. On December 27, 1996, the Court of International Trade again enjoined liquidation of those entries under 19 U.S.C. § 1516a(c)(2) pending appeal to this court. We affirmed the final judgment of the Court of International Trade on January 8, 1998, and issued our mandate on March 2, 1998. The ninety-day deadline for filing a petition for writ of certiorari to the United States Supreme Court expired on April 8, 1998, lifting the court-ordered suspension of liquidation.

On March 23, 1998, Commerce instructed Customs to liquidate the Second Review Entries at the rate of 106.846 percent *ad valorem*, thus implementing the 109.43 percent *ad valorem* dumping margin calculated by Commerce on second remand. Commerce sent its instructions in an e-mail, which Customs posted on a non-public (OTO3) bulletin board used to inform the ports of liquidation instructions. The e-mail announced the immediate lifting of the suspension of liquidation for the Second Review Entries and directed Customs to assess antidumping liability at 106.846 percent of the entered value for those entries.

Between May and September 1998, some two hundred Second Review Entries at the Ports of Los Angeles, San Diego, and El Paso were liquidated at the 106.846 percent rate.[2] The Second Review Entries at the Port of Nogales ("Nogales Entries"), however, were not liquidated pursuant to the March 23, 1998 instructions.

---

**2.** One entry at Los Angeles was overlooked. This "lost" Los Angeles entry yet to be liquidated, along with a "lost" entry at El Paso, which had been deemed liquidated on March 14, 2003, *Cemex*, 279 F.Supp.2d at 1359, was the subject of a later order by the Court of International Trade. *Cemex, S.A. v. United States*, No. 93–10–00659, 2003 WL 22225622,

Although Gloria Zapata Quihuis, the import specialist at Nogales responsible for entries of cement, reviewed the OTO3 bulletin board daily, she did not see the March 23, 1998 e-mail message from Commerce. When asked by the Assistant Port Director for Trade at the Port of Nogales to inquire as to the status of these entries, Ms. Quihuis responded on January 10, 2001:

> Minoo Hatten of the Commerce Department ... informs me that she found where the U.S. affirmed a 2nd remand in 1998. She said it would take her two or three days to track down whether or not any liquidation instructions were issued. She thinks that no instructions were issued. Once they find the information they will give me a call and let me know what the next step will be. She feels that at that point they will issue liquidation instructions.

On March 16, 2001, Ms. Hatten sent a copy of the March 23, 1998 liquidation instructions to Ms. Quihuis, stating "[p]lease get back to me and let me know whether these instructions will enable you to liquidate the unliquidated entries." On March 19, 2001, Thomas Ede at Customs Headquarters informed Ms. Quihuis that "[t]he entries of gray portland cement and clinker from Mexico covered by message 8082113 of 3/23/1998 deem liquidated [sic] by action of law in September, 1998" and that "[t]hese entries need to be liquidated 'as entered' in ACS." Accordingly, on March 20, 2001, Ms. Quihuis reported:

> On March 19, 2001 I spoke to Tom Ede of Headquarters OAB. I explained the situation and informed him that the instructions had never been posted. He told me he would look into this. He called back and confirmed that the instructions had never been posted on the bulletin board. *He told me that the entries were now considered deemed. He sent the attached instructions on liquidating the entries. Entries for Sunbelt Cement for the above listed period have been liquidated no change and notation posted on notes in ACS.*

(emphasis added).

On April 6, 2001, Customs published a bulletin notice at the Port of Nogales ("Bulletin Notice"), indicating that 121 of the Nogales Entries had been deemed liquidated as of September 23, 1998, and that 19 others had liquidated at "no change." All 140 entries were thus liquidated at the rate and amount of duties asserted by the importer upon entry, 56.94 percent *ad valorem.*

Ad Hoc first learned that some of the Second Review Entries had been liquidated "as entered" rather than at the final assessment rate upon filing a Freedom of Information Act ("FOIA") request with Customs on February 15, 2002. Ad Hoc had filed the FOIA request to inquire as to amounts distributed for the Second Review Entries under the Continued Dumping And Subsidy Offset Act of 2000, 19 U.S.C. § 1675c (the "CDSOA" or "Byrd Amendment"). The Byrd Amendment allows domestic producers with qualifying expenditures for a particular year to obtain a share of the antidumping duties collected by Customs for that year.

Customs responded by letter of September 24, 2002, forwarding four pages of the

---

*1, slip. op. 03–125 (Ct. Int'l Trade Sept. 25, 2003). The order denied Ad Hoc's motion for reconsideration of the August 12 Order, held the deemed liquidation of the El Paso entry final under 19 U.S.C. § 1514(a), and ordered the Los Angeles entry liquidated at the rate of 106.846 percent as required by 19 U.S.C. § 1516a(e).

Bulletin Notice. On December 12, 2002, the domestic producers requested that Customs reliquidate the entries consistent with the final judgment of the Court of International Trade, affirmed by this court in *Cemex I.* Finally, on April 4, 2003, Ad Hoc moved the Court of International Trade to enforce that judgment, requesting that the court direct liquidation of the Nogales Entries at the 106.846 percent *ad valorem* final assessment rate.

## II. PROCEEDINGS IN THE COURT OF INTERNATIONAL TRADE

In its August 12, 2003 Order, the Court of International Trade determined that proper deemed liquidation had not been established for any of the Nogales Entries, as the March 23, 1998 instructions to Customs were neither unambiguous nor public. *See Fujitsu Gen. Am., Inc. v. United States,* 283 F.3d 1364, 1379 (Fed.Cir.2002). While those instructions purported to "constitute the immediate lifting of suspension," the ninety-day period under 28 U.S.C. § 2101(c) to file for writ of certiorari did not expire until April 8, 1998.[3] The Court of International Trade stated: "Here, the March 23, 1998 notice was not public, and it cannot be said to be unambiguous where the suspension had not yet been lifted." *Cemex II,* 279 F.Supp.2d at 1362. Accordingly, the court held that the March 23, 1998 e-mail failed to trigger the six-month deemed liquidation period under 19 U.S.C. § 1504(d).

Turning next to the issue of what remedies may be available to Ad Hoc, the Court of International Trade observed that section 1504(d) was meant to benefit import-

ers: "The purpose of [19 U.S.C. § 1504(d)] is to *give importers finality* as to their duty obligations by providing for deemed liquidation at the rate claimed by the importers, unless actual liquidation occurred within specified time limits." *Id.* at 1360 (emphasis added) (citing *Int'l Trading Co. v. United States,* 281 F.3d 1268, 1272 (Fed. Cir.2002); *United States v. Cherry Hill Textiles, Inc.,* 112 F.3d 1550, 1559 (Fed. Cir.1997) ("The 'deemed liquidated' provision of section 1504 was added to the customs laws in 1978 to place a limit on the period within which importers and sureties would be subject to the prospect of liability for a customs entry.")). Accordingly, section 1504(d)

fits neatly into the Customs protest of liquidation scheme. If a deemed liquidation or any liquidation is adverse to an importer, it has its protest remedies under 19 U.S.C. § 1514 and access to judicial review under 28 U.S.C. § 1581(a). *Domestic parties have no specific avenue of relief for improper liquidation.* The Byrd Amendment might have been accompanied with a new administrative remedy provision for domestic parties, but it was not.

*Cemex II,* 279 F.Supp.2d at 1362 (emphasis added). As to the Nogales Entries, which were liquidated in 2001, the trial court concluded that "19 U.S.C. § 1514(a) bars Ad Hoc's claim because the liquidation became final as to 'all persons' after 90 days passed." *Id.*

The Court of International Trade further explained that section 1514(b), which suspends finality of liquidation upon the filing of an action contesting an antidumping duty determination, does not disturb

---

**3.** Commerce failed to publish a notice of the amended final results in the Federal Register, as required by 19 U.S.C. § 1516a(e).

the finality provisions of section 1514(a). Instead, it "assist[s] the statutory goal of not requiring parties to proceed on multiple fronts." *Id.* at 1362. Without pending proceedings, as in this case, "nothing in § 1514(b) indicates it prevents finality as to Customs' determinations after court proceedings are conclusively terminated." *Id.* "Otherwise," the Court of International Trade added, "there would never be finality, which is clearly contrary to the legislative intent." *Id.*

Here, the trial court held that

> Customs made a decision to recognize deemed liquidations and to post them. It is Customs' decision to declare deemed liquidation, not that of any other agency, which is at issue. Assuming Ad Hoc had any rights to prevent finality, under these circumstances it would have had to act within 90 days of the posting of notice of liquidation to avoid the effects of 19 U.S.C. § 1514(a).

*Id.* at 1362–63. Additionally, the court remarked, having waited beyond the 2001 collection year to apply for Byrd Amendment funds, Ad Hoc cannot complain about an erroneous liquidation in that year. "Ad Hoc should have pursued whatever remedies it had to enforce the judgment here promptly. Enforcement at this date would prejudice other parties by disrupting finality and the Byrd Amendment distribution scheme." *Id.* at 1363.

The Court of International Trade declined to order liquidation of the Nogales Entries at the final assessment rate. Consistent with that decision, on September 25, 2003, the Court of International Trade also ordered the liquidation of the single, unliquidated Los Angeles entry at the 106.846 percent rate required by 19 U.S.C. § 1516a(e) and declared the liquidation of

the El Paso entry final under 19 U.S.C. § 1514(a).

Ad Hoc timely appealed. Cemex cross-appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(5), and heard oral argument on August 2, 2004.

## III. DISCUSSION

■ We review the Court of International Trade's statutory interpretation *de novo*. *See VWP of Am., Inc. v. United States,* 175 F.3d 1327, 1334 (Fed.Cir.1999).

### A. *The Statutory Provisions*

We frame our discussion with the language of the relevant statutory provisions. Under 19 U.S.C. § 1504(d) (1993),

> [w]hen a suspension required by statute or court order is removed, the Customs Service shall liquidate the entry within 6 months after receiving notice of the removal from the Department of Commerce, other agency, or a court with jurisdiction over the entry. Any entry not liquidated by the Customs Service within 6 months after receiving such notice shall be treated as having been liquidated at the rate of duty, value, quantity, and amount of duty asserted at the time of entry by the importer of record.

Section 1514(a) provides, in relevant part:

> (a) Except as provided in subsection (b) of this section, section 1501 of this title (relating to voluntary reliquidations), section 1516 of this title (relating to petitions by domestic interested parties), and section 1520 of this title (relating to refunds and errors), decisions of the Customs Service, including the legality of all orders and findings entering into the same, as to—

. . .

(5) the liquidation or reliquidation of an entry, or reconciliation as to the issues contained therein, or any modification thereof;

. . .

shall be final and conclusive upon all persons (including the United States and any officer thereof) unless a protest is filed in accordance with this section. . . .

Finally, according to section 1516a(e)(2):

(e) If the cause of action is sustained in whole or in part by a decision of the United States Court of International Trade or of the United States Court of Appeals for the Federal Circuit—

(1) entries of merchandise of the character covered by the published determination of the Secretary, the administering authority, or the Commission, which is entered, or withdrawn from warehouse, for consumption after the date of publication in the Federal Register by the Secretary or the administering authority of a notice of the court decision, and

(2) entries, the liquidation of which was enjoined under subsection (c)(2) of this section,

shall be liquidated in accordance with the final court decision in the action. Such notice of the court decision shall be published within ten days from the date of the issuance of the court decision.

**B.** *Were The Nogales Entries Deemed Liquidated Under Section 1504(d)?*

We begin our analysis by considering Cemex's assertion that the Court of Inter-national Trade erred in holding that the Nogales Entries did not liquidate by operation of law under 19 U.S.C. § 1504(d). Cemex contends that the March 23, 1998 e-mail from Commerce to Customs was clear and unambiguous, and, therefore, sufficient to effectuate a deemed liquidation under section 1504(d). Cemex further asserts that while *Fujitsu* and *International Trading* provide that the notice to Customs "should be" both unambiguous and public, nothing in the statute itself requires that the notice be public so long as it is unambiguous.

Cemex claims that Commerce's March 23, 1998 instructions to Customs were unambiguous and were, in fact, followed by Customs in liquidating the majority of Second Review Entries at the 106.846 percent duty rate.[4] At most "premature," Commerce's March 23, 1998 instructions simply did not become effective until April 8, 1998, when the ninety-day period for filing petitions for certiorari expired. The Nogales Entries, Cemex argues, liquidated by operation of law six months later, on October 9, 1998, and became "final and conclusive upon all persons" under 19 U.S.C. § 1514(a) after ninety days, on January 7, 1999.

■ We are not persuaded by Cemex's arguments. As we held in *Fujitsu*, the suspension of liquidation under 19 U.S.C. § 1516a(c)(2) cannot be removed until the time for petitioning the Supreme Court for certiorari expires. 283 F.3d at 1379. That date for the Second Review Entries was April 8, 1998, ninety days from the day this court entered its judgment in *Cemex I.* The end of the suspension period, in

4. Not surprisingly, Ad Hoc does not contest the liquidation of those entries at the final assessment rate, even though these liquidations occurred pursuant to a premature notice from Commerce.

turn, is a prerequisite for valid notice under section 1504(d). Customs must liquidate entries as instructed only "[w]hen a suspension required by statute or court order is removed" and when it receives notice of such removal and the proper antidumping duty rate from Commerce. *See* 19 U.S.C. § 1504(d). As we explained in *Fujitsu,* "in order for a deemed liquidation to occur, (1) the suspension of liquidation that was in place must have been removed; (2) Customs must have received notice of the removal of the suspension; and (3) Customs must not liquidate the entry at issue within six months of receiving such notice." 283 F.3d at 1376.

In this case, Commerce sent its e-mail instructions on March 23, 1998, *before* the ninety-day deadline for filing petitions for certiorari had expired on April 8, 1998. The March 23, 1998 e-mail was thus ineffective in triggering the six-month deemed liquidation period under section 1504(d). We, therefore, agree with the Court of International Trade that the March 23, 1998 notice "cannot be said to be unambiguous where the suspension had not yet been lifted." *Cemex II,* 279 F.Supp.2d at 1362.

Our case law further requires that, in addition to being unambiguous, the notice to Customs be public.[5] *See Int'l Trading,* 281 F.3d at 1275–76. In fact, section 1516a(e) requires that notice of decisions of the Court of International Trade or this court sustaining decisions in antidumping duty proceedings be "published within ten

days from the date of the issuance of the court decision."[6] No such publication occurred here. To the contrary, Commerce's e-mail to Customs clearly stated "this e-mail message is not to be disclosed to the public." In keeping with those instructions, Customs posted the e-mail on an internal, non-public bulletin board. The Court of International Trade correctly held that the March 23, 1998 notice purporting to lift the suspension of liquidation was not public, and, as such, failed to commence the six-month statutory period.

Accordingly, we affirm the Court of International Trade's holding that the instructions to Customs did not provide proper notice and thus could not, and did not, start the six-month clock for deemed liquidation under 19 U.S.C. § 1504(d).

## C. *Do The Finality Provisions In Section 1514(a) Bar Ad Hoc's Claim?*

While Ad Hoc agrees with the Court of International Trade that none of the Second Review Entries had been deemed liquidated under 19 U.S.C. § 1504(d), it challenges the trial court's holding that the finality provisions of 19 U.S.C. § 1514(a) preclude judicial review of Customs' decision to recognize and post the deemed liquidations. Ad Hoc argues that under 19 U.S.C. § 1516a(e)(2), Customs was required to liquidate the Nogales Entries in accordance with the "final court decision in the action" at the final assessment rate of 106.846 percent *ad valorem.*

Ad Hoc presents several arguments that 19 U.S.C. § 1514(a) does not bar judicial

---

**5.** These "requirements," while not expressly part of the statute, constitute this court's interpretation of the statutory language in view of its legislative history. We are bound to follow our own precedent unless it is overruled by the Supreme Court or an *en banc* decision of this court. Cemex's arguments that it is merely our case law, rather than the statute itself, that requires notice to be public and unambiguous are misplaced.

**6.** As the *Fujitsu* court observed, section 1516a(e) sets forth no consequences for failure to comply with its publication requirement. 283 F.3d at 1382.

review of its claim. First, it contends that Congress intended that the Court of International Trade exercise judicial review over a domestic industry's challenge to Custom's erroneous liquidation of entries subject to an antidumping administrative review. Second, Ad Hoc argues that the posting of the Bulletin Notice by Customs cannot effect a liquidation under 19 U.S.C. § 1504(d), which can only occur by operation of law. Third, because the posting of the Bulletin Notices did not constitute a "decision of the Customs Service," Ad Hoc claims that section 1514(a) does not apply. We consider each of Ad Hoc's arguments in turn.

1. *Does 19 U.S.C. § 1514(a) Grant Domestic Producers The Right To Judicial Review?*

■ The trial court noted that "[i]f a deemed liquidation or any liquidation is adverse to an importer, it has protest remedies under 19 U.S.C. § 1514 and access to judicial review under 28 U.S.C. § 1581(a)." *Cemex II,* 279 F.Supp.2d at 1362. By contrast, domestic parties have no specific avenue of relief for improper liquidation. Unlike importers, domestic parties are limited to *prospective* challenges to the rate and classification of antidumping duty decisions, as provided in 19 U.S.C. § 1516. Ad Hoc nonetheless contends that Congress clearly intended that the Court of International Trade exercise judicial review over a domestic industry's challenge to Customs' erroneous liquidation of entries notwithstanding the "final and conclu-

sive" language in 19 U.S.C. § 1514(a). We disagree.

Section 1514(a) is subject to several exceptions.[7] Two of these exceptions are pertinent. Specifically, as the trial court aptly noted, section 1514(a) is subject to subsection (b), which speaks to finality of Customs officers' determinations "unless a civil action contesting a determination listed in section 1516a of this title is commenced in the United States Court of International Trade...." Section 1516a affords "interested parties," including domestic producers, judicial review in countervailing duty and antidumping proceedings. Yet, as the trial court reasoned, "nothing in § 1514(b) indicates it prevents finality as to Customs' determinations after court proceedings are conclusively terminated." *Id.* In other words, while Ad Hoc had challenged the antidumping duty determinations for the Second Review Entries under section 1516a(a)(2)(B)(iii), those proceedings had terminated on April 8, 1998, with no petition for certiorari filed in the Supreme Court. Section 1514(b), thus, could not act as a bar to the finality provisions of section 1514(a).

Neither could section 1516 prevent finality. Designed to enable domestic manufacturers to contest Commerce's determinations regarding the appraised value, classification, or rate of duty on imported merchandise,[8] section 1516 contemplates remedies solely prospective in nature, and cannot after-the-fact cure Customs' decisions with respect to liquidation, legal or

---

**7.** "Except as provided in subsection (b) of this section, section 1501 (relating to voluntary reliquidations), section 1516 (relating to petitions by domestic parties), and section 1520 (relating to refunds and errors) of this Act, decisions of the Customs Service, including the legality of all orders and findings entering

into the same ... shall be final and conclusive upon all persons...." 19 U.S.C. § 1514(a).

**8.** Here, Ad Hoc challenges the actions of Customs rather than Commerce. Accordingly, section 1516 does not apply.

illegal. As we observed in *National Corn Growers Association v. Baker,*

> [t]he House Report to the Customs Court Act of 1980 detailed that section 1516 permits American manufacturers to protest administrative determinations regarding imported merchandise, citing to former section 1582(b) defining the scope of such protests. 1980 U.S. Code Cong. & Admin. News 3729, 3756, H.R. No. 1235, 96th Cong., 1st Sess., at 45. After much debate, Congress determined that any relief forthcoming from such objections could only be prospective in nature.

840 F.2d 1547, 1551 (Fed.Cir.1988).

In sum, section 1514 extends judicial review to domestic producers through sections 1516 and 1516a. As neither exception applies, Ad Hoc is without recourse to challenge Customs' decision to liquidate the Nogales Entries at the "as entered" rate.

### 2. *Did Customs' Posting Of The Bulletin Notices Effect A Deemed Liquidation Under Section 1504(d)?*

■ Ad Hoc contends that Customs' posting of the Bulletin Notice in April 2001 cannot constitute a deemed liquidation, which occurs solely by operation of law. We need not reach this question, because we agree with the Court of International Trade that Customs' decision to acknowledge that liquidation, deemed or otherwise, had occurred falls within the purview of

section 1514(a) and is, therefore, "final and conclusive upon *all* persons"—including Ad Hoc.

### 3. *Did Customs Make A "Decision" Regarding Liquidation Within The Meaning Of 19 U.S.C. § 1514(a)?*

In March 2001, Customs Headquarters informed the import specialist at the Port of Nogales "that the [Second Review] entries were now considered deemed [and] sent the attached instructions on liquidating the entries." The liquidation of those entries "as entered" was promptly posted. The Court of International Trade characterized this act by Customs officials as a "decision to recognize deemed liquidations and to post them," adding that "[i]t is Customs' decision to declare deemed liquidation, not that of any other agency, which is at issue." *Cemex II,* 279 F.Supp.2d at 1362–63. We agree.

Customs made an affirmative determination to acknowledge and implement the deemed liquidation of the Nogales Entries pursuant to Commerce's March 23, 1998 e-mail.[9] Operating under the mistaken belief that the March 23, 1998 email from Commerce had been timely and valid, Customs chose to recognize the legal fiction of deemed liquidation at the "as entered" rate rather than apply section 1516a(e)(2) to liquidate the subject entries at the final rate of 106.846 percent *ad valorem.*[10]

■ Ad Hoc relies on *Mitsubishi Electronics America v. United States,* 44 F.3d 973 (Fed.Cir.1994), to argue these acts do not constitute a "decision" by Customs

---

**9.** Because we hold that Ad Hoc had no avenue under section 1514 to contest Customs' improper liquidation of the Nogales entries, we need not pass on the trial court's determination that Ad Hoc should have taken action within the ninety-day protest period allowed importers to avoid the effects of section 1514(a).

**10.** As this court noted in *Fujitsu,*

[s]ection 1504(d) and section 1516a(e) are separate statutes. Section 1504(d) governs deemed liquidation. Deemed liquidation under section 1504(d) can occur only if Customs fails to liquidate entries within six months of having received notice of the removal of a suspension of liquidation. In addition, there is no statutory language in section 1516a(e) that attaches a conse-

within the meaning of section 1514(a). Not so. In *Mitsubishi*, we held that the challenged action was not that of Customs but of Commerce, and thus outside the confines of section 1514(a). In that case, the importer filed a protest challenging Commerce's assessment of duty rates on its entries of DRAMS between the preliminary and final less-than-fair-value determinations at the previous, higher rate rather than at the final rate computed. After its protest was denied, the importer appealed to the Court of International Trade, which determined that it lacked jurisdiction to entertain the claim. In affirming the Court of International Trade, we explained that the importer's protest under section 1514(a) was improper, as the challenged actions, *i.e.*, the improper calculation of antidumping duties, were within the province of Commerce rather than Customs. "Commerce conducts the antidumping duty investigation, calculates the antidumping margin, and issues the antidumping duty order." *Mitsubishi*, 44 F.3d at 976. Instead, "Customs merely follows Commerce's instructions in assessing and collecting duties." *Id.* at 977.

While we agree that Customs' role in making *antidumping decisions, i.e.*, in calculating antidumping duties, is generally

ministerial, Customs here made a decision regarding *liquidation.*[11] Following an inquiry into the legal posture of the Second Review Entries, Customs chose to effect their liquidation by posting the Bulletin Notices.[12] More than passive or ministerial, Customs' actions constitute a "decision" within the context of section 1514(a). Customs' admittedly erroneous decision to liquidate falls within the ambit of section 1514(a)(5), which shields such decisions from challenge, without regard for their legality.[13]

Our prior decision in *Juice Farms, Inc. v. United States*, 68 F.3d 1344 (Fed.Cir. 1995), is instructive. In *Juice Farms*, we held untimely an importer's protest of Customs' illegal liquidations of orange juice entries subject to suspension of liquidation orders pending antidumping investigations and administrative reviews. *Id.* at 1346. Because of the suspension order, the importer had failed to monitor the bulletin notices posted by Customs and did not learn of the premature assessment of duties until the ninety-day protest period had passed. Interpreting section 1514(a) to mean that "all liquidations, whether legal or not, are subject to the timely protest requirement," we rejected the importer's argument that the ninety-day period

quence to a failure by Commerce to meet the ten-day publication requirement, let alone the consequence of deemed liquidation under section 1504(d).
283 F.3d at 1382.

11. In *Fujitsu*, for example, we discussed Customs' liquidation at an allegedly erroneous rate as falling within section 1514(a)(5), distinct from its allegedly improper assessment of interest, which comes under section 1514(a)(3). 283 F.3d at 1370–74.

12. Ad Hoc essentially argues that *no* decision of Customs regarding liquidation can ever fall under section 1514(a), despite the plain language of the statute that "decisions of the Customs service, including the legality of all orders and findings entering into the same, as

to ... (5) the liquidation or reliquidation of an entry ... shall be final and conclusive upon all persons...." This cannot be.

13. Decisions of the Court of International Trade in *AK Steel Corporation v. United States*, 281 F.Supp.2d 1318 (2003) and *LG Electronics U.S.A., Inc. v. United States* are distinguishable as both involved liquidations in violation of an injunctive order. In *AK Steel*, for instance, the trial court explained that "[a] claim for an unqualified right to commit an admittedly illegal act and then invoke [section 1514] to assert immunity in such illegality is breathtaking for its chutzpah." 281 F.Supp.2d at 1322.

should, under those circumstances, be subject to equitable tolling. Instead, we held that where Customs had posted public bulletin notices of its liquidations, those notices supplied sufficient notice to trigger the ninety-day protest window.[14] We further explained that the importer bears the burden to check for posted notices of (admittedly premature) liquidation and to protest timely. Absent such watchfulness, "Juice Farms cannot circumvent the timely protest requirement by claiming that its own lack of diligence requires equitable relief under 28 U.S.C. § 1581(i)." *Id.*

In *Juice Farms*, importers who failed to file a timely protest were left with no legal recourse to challenge improper liquidation. While we recognize that section 1514(c)(2) does not grant protest rights to domestic producers,[15] we find no statutory basis for concluding that, in the absence of express remedies under the statute, Ad Hoc has greater rights than those persons authorized by statute to file protests or that Ad Hoc has more time to do so than the ninety days allotted.

Like *Juice Farms*, this case asks the question of who bears the brunt of monitoring the implementation of antidumping duties. Clearly, where the final assessment rate greatly exceeds the "as entered" rate, the importers will have little, if any, incentive to ensure that the higher rate is applied. That burden must by necessity fall on the other interested parties, here, the domestic producers.

This result, while seemingly harsh, was not unavoidable, as Ad Hoc should have heeded the repeated warning signs. Ad Hoc should have perceived the first sign of trouble when Commerce failed to publish the required notice of the final duty assessment in the Federal Register. In the absence of a Federal Register notice, Ad Hoc should have looked for public liquidation instructions from Commerce, which never issued. Finally, Ad Hoc should have watched for the notice of liquidation at the Port of Nogales, not posted by Customs until some three years after the final judgment in *Cemex I*. In view of these notable and noticeable omissions, Ad Hoc should have moved the Court of International Trade to enforce the judgment in 1998, rather than in 2003. Here, where Congress declined to give domestic producers protest rights, monitoring the enforcement of its court judgment fell upon Ad Hoc. Unfair as that may seem, the proper forum for remedying the harshness of the statute is Congress, not this court.

## CONCLUSION

The decision of the Court of International Trade denying Ad Hoc's motion to enforce the judgment is

*AFFIRMED.*

---

**14.** While *Juice Farms* involved actual liquidations rather than deemed liquidations, in view of our holding that Customs' posting of bulletin notices of liquidations constitutes a "decision" under section 1514(a), the rationale of *Juice Farms* applies.

**15.** Protests may be filed by "(A) the importers or consignees shown on the entry papers, or their sureties; (B) any person paying any charge or exaction; (C) any person seeking entry or delivery; (D) any person filing a claim for drawback; (E) with respect to a determination of origin under section 202 of the North American Free Trade Agreement Implementation Act, any exporter or producer of the merchandise subject to that determination, if the exporter or producer completed and signed a NAFTA Certificate of Origin covering the merchandise; or (F) any authorized agent of any of the persons described in clauses (A) through (E)." 19 U.S.C. § 1514(c)(2).