# United States Court of Appeals for the Federal Circuit

---

**JUDITH LOUISE CRONIN,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

---

2013-5061

---

Appeal from the United States Court of Federal Claims in No. 06-CV-0633, Senior Judge Eric G. Bruggink.

---

Decided: August 28, 2014

---

JEFFERY M. CHIOW, Rogers Joseph O'Donnell, of Washington, DC, argued for plaintiff-appellant.

DOUGLAS G. EDELSCHICK, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were STUART F. DELERY, Acting Assistant Attorney General, JEANNE E. DAVIDSON, Director, and DONALD E. KINNER, Assistant Director. Of counsel on the brief was MATTHEW R. ROUSH, Lieutenant,

Office of the Judge Advocate General, United States Department of the Navy, of Washington Navy Yard, DC.

_____

Before TARANTO, SCHALL, and LINN, *Circuit Judges.*[*]

Opinion for the court filed by *Circuit Judge* TARANTO.

Opinion concurring in part and concurring in part in the result filed by *Circuit Judge* LINN.

TARANTO, *Circuit Judge.*

Commander Judith L. Cronin appeals the final judgment of the Court of Federal Claims granting judgment on the administrative record for the United States and dismissing her complaint, which alleged a wrongful denial of a promotion and an unduly low disability rating by the Navy. *Cronin v. United States*, 108 Fed. Cl. 39 (Fed. Cl. 2012) ("*Opinion*"). The Trial Court concluded that her claims were not time barred but that she had failed to demonstrate reversible error on the merits. We hold that most of her claims were time barred, which means that there was no jurisdiction to decide them. As to one group of claims, *i.e.*, those alleging post-traumatic stress disorder, there is no timeliness issue, but we see no error in the Trial Court's rejection of those claims on the merits.

## I. BACKGROUND

Commander Cronin was on active duty with the Navy from 1977 until the Navy placed her on the Temporary Disability Retired List (sometimes "TDRL" or "List") on May 31, 1996. *Cronin v. United States*, 98 Fed. Cl. 268, 269 (Fed. Cl. 2011) ("*Cronin III*"). During and after her service, she experienced a number of physical ailments

_____

[*]    Pursuant to Fed. Cir. Rule 47.11, Circuit Judge Schall has been designated to replace Randall R. Rader, now retired, on this panel.

and injuries. In 1978, she began experiencing problems with her right heel as a result of a calcaneal spur, and she had surgeries in 1979, 1993, 1994, and 1995 attempting to correct the problems. The surgeries were unsuccessful, and by 1995 the right-heel problem produced ongoing foot pain, pain in other parts of her body from walking on her right foot (even with orthotics), and an uneven gait. *Opinion* at 53. In 1979 or 1980, she began to experience other ailments, for which she received treatment from 1984 at least until 1998. *Id.* at 53–54. She was hospitalized for bipolar disorder in 1995. *Id.* at 57–58. Beginning in approximately 1998, medical professionals expressed differing opinions about whether she was suffering from bipolar disorder, anxiety disorder, post-traumatic stress disorder ("PTSD"), or some combination of those disorders. *Id.* at 58–59. In September 1999, she was diagnosed with chronic pain. *Id.* at 57. Commander Cronin has alleged that during her period of service, she was subjected to multiple physical and sexual assaults, stalking, and "extreme sexual harassment." J.A. 129. At least one medical professional, a social worker, wrote a report describing such assaults and harassment as supporting a PTSD diagnosis. *Opinion* at 59.

The Navy's Medical Evaluation Board reviewed Commander Cronin's condition on November 15, 1993, and April 16, 1994, and each time recommended that she be placed on limited duty due to the right-heel injury. J.A. 128. The second period of limited duty had an expiration date of September 12, 1994. *Id.* In May 1994, the Navy had selected Commander Cronin, then a Lieutenant Commander, for promotion to the rank of Commander, which was set to occur on October 1, 1994. J.A. 75; *Opinion* at 42. She was "frocked" to the rank of Commander on August 25, 1994 and, that same month, underwent one of her heel surgeries. In an August 1994 letter, however, a Navy physician found that Commander Cronin was not fit for full duty. *Opinion* at 42. In a letter that carries the

date September 30, 1994, the Chief of Naval Personnel notified her that she was found not fit for duty—referring to a Medical Evaluation Board report that did not issue until October 5, 1994—and announced that her promotion would be delayed. *Id.* The letter offered Commander Cronin the opportunity to challenge the delay of her promotion within ten days of her receipt of this letter. *Id.* She received the letter by October 14, 1994, and she responded on October 26, 1994. *Id.*

The Navy referred Commander Cronin's case to its Disability Evaluation System, and in October 1995 the Navy's Physical Evaluation Board received the case for review. *Id.* at 42–43. That Board evaluated six of Commander Cronin's physical ailments and placed each into one of three categories: (1) unfitting conditions; (2) conditions that contribute to unfitting conditions; and (3) conditions that are not separately unfitting and do not contribute to unfitting conditions. Based on its disability findings, the Board found her unfit to perform her duties, assigned her a disability rating of 60%, and, because her conditions had not yet stabilized, stated that she was to be placed on the Temporary Disability Retired List, according her disability benefits. *Id.* at 43; J.A. 96–99.

In January 1996, Commander Cronin challenged the delay in her promotion before a different Navy board, namely, the Board for Correction of Naval Records. The Board for Correction, in mid-May 1996, determined that the delay was justified based on the concerns over her fitness for full duty. *Id.* On May 31, 1996, Commander Cronin was issued Form DD-214, formally placing her on the Temporary Disability Retired List and simultaneously promoting her to Commander. *Cronin III* at 269.

Having been placed on the TDRL, Commander Cronin was subject to reevaluation of her conditions every 18 months in order to continue receiving disability benefits. *Opinion* at 43. In March 2000, the Physical Evaluation

Board concluded that her conditions had not yet stabilized but made several adjustments, for various reasons, to her disability rating.  It was during the proceedings in which those adjustments were made that Commander Cronin first raised post-traumatic stress disorder as an issue. Ultimately, in August 2000, the Physical Evaluation Board declined to find a compensable claim of PTSD because there had been no finding, at the time she was placed on the List in 1996, that such a condition rendered her unfit for duty.  The Physical Evaluation Board appears to have reached the same conclusion with respect to the chronic pain disorder.  And it concluded that her conditions had stabilized, so that on October 1, 2000, after the August decision became final, the Navy placed her on the Permanent Disability Retired List, permanently retiring her.  *Id.*  Commander Cronin challenged the findings before the Board for Correction, which in 2004 denied her relief.  *Id.* at 43–44.

Commander Cronin filed suit on September 7, 2006, challenging the Board for Correction's 1996 decision regarding her delayed promotion and its 2004 decision regarding her disability rating.  *Cronin III* at 269.  The Trial Court initially ruled that all but the PTSD-related claims were time barred and that the decision related to PTSD was not arbitrary and capricious, but it remanded to the Board for Correction for reevaluation of Commander Cronin's annuity payments.  *Id.*  On appeal to this court, we vacated the judgment and remanded for the Trial Court to consider whether the Servicemembers Civil Relief Act of 2003, Pub. L. No. 108-189, § 206, 117 Stat. 2835, 2844 (2003) (codified at 50 U.S.C. app. §§ 511(2), 526(a)), tolled the statute of limitations and, if so, whether the disabling conditions were exacerbated by PTSD. *Cronin v. United States*, 363 F. App'x 29 (Fed. Cir. 2010).

On remand, the Trial Court concluded that the 2003 Relief Act does toll the statute of limitations during the time a service member is on the Temporary Disability

Retired List, so that all of Commander Cronin's claims were timely. *Cronin III* at 278. The Trial Court then remanded to the Board for Correction for consideration of her PTSD claims, but the Board for Correction subsequently declined to increase her disability rating. *Opinion* at 42. Commander Cronin appealed that decision to the Trial Court, which affirmed on cross motions for judgment on the administrative record. *Opinion* at 61.

Commander Cronin appeals. This court has jurisdiction under 28 U.S.C. § 1295(a)(3).

## II. STANDARDS OF REVIEW

The proper interpretation of the Relief Act's tolling provision as it relates to the Temporary Disability Retired List is a legal issue of first impression for this court. We decide such issues of statutory interpretation de novo. *Cemex, S.A. v. United States*, 384 F.3d 1314, 1319 (Fed. Cir. 2004).

We also review the Trial Court's judgment on the administrative record de novo, applying the same standard of review to the Board for Correction decision as the Trial Court applied. *Melendez Camilo v. United States*, 642 F.3d 1040, 1044 (Fed. Cir. 2011). Our review is limited to determining whether a Board for Correction decision "is arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations." *Id.* (internal quotation marks omitted).

## III. Discussion

### A. The Relief Act's Tolling Provision

We conclude that, except for the claims based on post-traumatic stress disorder, Commander Cronin's claims were time barred, because the Servicemembers Civil Relief Act, 50 U.S.C. app. §§ 511(2), 526(a), did not toll the six-year statute of limitations, 28 U.S.C. § 2501, for the 4 years and five months that she was on the Temporary Disability Retired List under 10 U.S.C. § 1202. Untimeliness under this statute of limitations is "jurisdictional." *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134 (2008). Accordingly, our conclusion regarding lack of timeliness requires that we vacate the judgment on the non-PTSD claims and remand for dismissal of those claims for lack of jurisdiction.

Putting aside the PTSD claim, the parties agree that Commander Cronin's claims accrued more than six years before she filed suit in the Court of Federal Claims in September 2006, which makes them out of time under the six-year statute of limitations, 28 U.S.C. § 2501, unless some of the period is excluded from the time counted. They also agree, however, that all claims here are timely if the time that Commander Cronin spent on the Temporary Disability Retired List—from May 31, 1996, to October 1, 2000—is not counted. The question therefore is whether time spent on the List is to be excluded in computing the time from accrual to suit.

The 2003 Relief Act, updating earlier statutes, declares that "[t]he period of a servicemember's military service may not be included in computing any period . . . for the bringing of any action . . . by . . . the servicemember." 50 U.S.C. app. § 526(a). The Act also defines "military service."

The term "military service" means—(A) . . . (i) active duty, as defined in [10 U.S.C. § 101(d)(1)],

and (ii) in the case of a member of the National Guard, includes service under a call to active service . . . ; (B) in the case of a servicemember who is a commissioned officer of the Public Health Service or the National Oceanic and Atmospheric Administration, active service; and (C) any period during which a servicemember is absent from duty on account of sickness, wounds, leave, or other lawful cause.

50 U.S.C. app. § 511(2). The parties agree that Commander Cronin was not on "active duty" once she was placed on the Temporary Disability Retired List.[1] The matter in dispute is whether she was "absent from duty on account of sickness, wounds, leave, or other lawful cause" once she was placed on the List.

The phrase "absent from duty," alone and in context, fairly implies that the clause applies only when the duty to engage in active service remains in place during, and fulfillment is excused only by, sickness, wounds, leave, or other cause. The implication of the phrase "absent from duty" is that there is a persisting duty, but the member of the service is, for good reason, temporarily unable to fulfill it. The context, moreover, indicates that the duty that persists (subject to the excuse) is one of "active" service, not, for example, a duty to remain in reserve or even to show up for two weeks of training as a member of the National Guard (*see Bowen v. United States*, 292 F.3d

---

[1]  10 U.S.C. § 101(d)(1) states: "The term 'active duty' means full-time duty in the active military service of the United States. Such term includes full-time training duty, annual training duty, and attendance, while in the active military service, at a school designated as a service school by law or by the Secretary of the military department concerned. Such term does not include full-time National Guard duty."

1383, 1386–87 (Fed. Cir. 2002)). The "absent from duty" clause follows three clauses all of which are about active service. This last clause is naturally understood to complement and round out, not fundamentally depart from, the core condition of being subject to the military's control to order active service when conditions permit. In its language and in context, the "absent from duty" clause thus fairly encompasses only a situation in which the active-service duty remains—in which military authority to compel active service remains—during a period when, for good cause, the member of the service cannot engage in the otherwise-required active service.

A member of the Navy like Commander Cronin who has been placed on the Temporary Disability Retired List—for a disability that "may be of a permanent nature" but that may change, 10 U.S.C. § 1202—is not subject to an ongoing but suspended duty to serve. Simply, the military cannot order her back to active service, even if the sickness, injury, leave, or other cause for having stopped active service no longer prevents active service. For the Navy to return her to active duty, she must "consent." 10 U.S.C. § 1211(b).

More specifically, the statute provides for periodic medical examinations to evaluate the status of disabilities of persons on the Temporary Disability Retired List and requires a final decision within five years. 10 U.S.C. § 1210(a), (b). If the disability is deemed permanent and stable, retirement or separation follows, depending on the degree of disability and length of service. *Id.* § 1210(c)–(e). If deemed fit, the member is to reenter active service upon giving consent, or to be discharged, retired, eliminated from active service, or transferred to certain reserve units (voluntarily, as relevant here). *Id.* §§ 1210(f), 1211.[2]

---

[2] For a naval officer like Commander Cronin, section 1210 refers to the Fleet Reserve. Besides other

If she does not consent to reentering active service, and she is not discharged, retired, or (voluntarily) transferred to certain reserve units, her "status on the temporary disability retired list and [her] disability retired pay shall be terminated as soon as practicable and the member shall be discharged." *Id.* § 1211(c).

In this statutory scheme, a service member's obligatory active military service ends upon placement on the Temporary Disability Retired List. It is her option not to return to active service even if later found to be physically fit. The duty to serve has ended. Reflecting the end of duty, the Navy issued Defense Department Form 214, Certificate of Release or Discharge from Active Duty, to Commander Cronin upon placing her on the Temporary Disability Retired List, effective June 1, 1996. J.A. 104–05. No new Form 214 was issued when, on October 1, 2000, seven months before the five-year deadline arrived, the Navy placed her on the Permanent Disability Retired List. J.A. 51.[3]

Other aspects of the statutes governing the List, though perhaps not sufficient if they stood alone, reinforce the point that is crucial given the "duty" language of

---

conditions, transfer into the Fleet Reserve requires the officer's consent. 10 U.S.C. § 6330.

[3] A 2009 Report of the Government Accountability Office concluded that, across the entire Department of Defense, "very few who were placed on the list between calendar years 2000 and 2003 returned to military service. Further, about half received a final determination within 3 years . . . ." United States Government Accountability Office, *Military Disability Retirement: Closer Monitoring Would Improve the Temporary Retirement Process* at i (Report to the Ranking Member, Committee on Oversight and Government Reform, U.S. House of Representatives) (GAO 29-09-289 April 2009).

section 511(2)(C)—that placement on the List is not a pause in, but a termination of, the active-service duty that is the subject of section 511(2). Thus, even when a member who has been placed on the List consents to return to active duty, the statutory process is not simple recall but, generally, reappointment (with Senate advice and consent if the rank is high enough) or reenlistment. *Id.* § 1211(b). A new duty is created, though the military is authorized (not required) to give credit, for seniority purposes, for time on the List. *Id.* § 1211(e).

Statutory provisions addressing military pay further reinforce the point. A person placed on the Temporary Disability Retired List is considered temporarily retired and therefore receives only retired-member pay. *Id.* §§ 1202, 1210(a). That pay status continues unless and until she "is appointed, reappointed, enlisted, or reenlisted." *Id.* § 1211(d)(3). In contrast, a service member who is "absent because of sickness or wounds, or who is directed . . . to be absent from duty to await orders pending disability retirement proceedings for a period that is longer than the leave authorized" by 10 U.S.C. § 701 is "entitled to the pay and allowances to which he would be entitled if he were not so absent." 37 U.S.C. § 502(a). (Pay is, in general, forbidden for overlength leave for other reasons. *Id.* § 502(b).) These provisions underscore the distinction between absences from a still-extant duty and the status of a service member once placed on the Temporary Disability Retired List, when no continuing duty of service exists.

The statutory statement of purposes does not change this conclusion. Congress stated that "[t]he purposes of the" 2003 Act are

> (1) to provide for, strengthen, and expedite the national defense through protection extended by this Act to servicemembers of the United States to en-

able such persons to devote their entire energy to the defense needs of the Nation; and

(2) to provide for the temporary suspension of judicial and administrative proceedings and transactions that may adversely affect the civil rights of servicemembers during their military service.

50 U.S.C. app. § 502. Even by its terms, this statement does not declare an unqualified purpose to enable a service member to focus on improving health to return to active service. It declares both a purpose to advance the national defense "through protection extended by this Act," that specified degree of protection being intended to enable service members to concentrate on defense needs, *id.* § 502(1), and a purpose to provide for temporary suspension of certain specified civil proceedings and transactions during "military service," a defined term, *id.* § 502(2). Section 502 itself thus reinforces the background recognition that "no legislation pursues its purposes at all costs," so that what a statute prescribes in its operational provisions, fairly construed in light of language, structure, and purposes, controls interpretation. *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987); *see, e.g.*, *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2185 (2014); *Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2044 (2012). Here, Congress defined how far civil-proceeding and other protections would extend by drawing a line defined by the language of 50 U.S.C. app. § 511—a line that does not separate those unable to attend to legal affairs from those able to do so: both groups may be found among persons on the Temporary Disability Retired List, just as both groups may be found among persons who are permanently retired (and thus undisputedly outside § 511). For the reasons stated, we do not think that the language Congress adopted covers a service member who has been formally placed on the Temporary Disability Retired List.

Precedents on the issue presented are not determinative. One set of decisions supports our conclusion. Thus, in statutory contexts other than the application of 50 U.S.C. app. §§ 511 and 526, precedents of this court and others have treated placement on the Temporary Disability Retired List as relieving a service member of a duty to serve. *Craft v. United States*, 544 F.2d 468, 471, 476 (Ct. Cl. 1976) ("[a] serviceman who is on the List is separated from the Army, but his final status is deferred pending additional medical evidence"; service member on List is "actually separated from the military"); *Dambrava v. Office of Personnel Mgmt.*, 466 F.3d 1061, 1063 (Fed. Cir. 2006) (10 U.S.C. § 1211 "indicates that the status of a member on the [Temporary Disability Retired List] is akin to inactive duty or retirement, as opposed to 'active service'"); *Bradley v. United States*, 161 F.3d 777, 781–82 (4th Cir. 1998) (*Feres* doctrine exception to Federal Tort Claims Act liability); *Cortez v. United States*, 854 F.2d 723, 726 (5th Cir. 1988) (same); *see also Dean v. United States*, 92 Fed. Cl. 133, 152–54 (Fed. Cl. 2010) (adopting this view under 50 U.S.C. app. §§ 511 and 526), *aff'd*, 416 F. App'x 908 (Fed. Cir. 2011).

On the other hand, the contrary conclusion drawn by Judge Linn in his opinion—that a person on the Temporary Disability Retired List is absent from duty under section 511(2)(C)—finds support in two decisions: *Mason v. Texaco Inc.*, 862 F.2d 242 (10th Cir. 1988); and *Cruz v. General Motors Corp.*, 308 F. Supp. 1052 (S.D.N.Y. 1970). The courts in those cases applied the Soldiers' and Sailors' Civil Relief Act of 1940, Act Oct. 17, 1940, ch. 888, 54 Stat. 1178, which (in § 101, 54 Stat. 1179) contained the same "absent from duty" phrase as current section 511 and (in § 205, 54 Stat. 1181) provided for exclusion of "military service" periods from computations of limitations periods. The *Mason* and *Cruz* courts held that time on the List was excluded for limitations purposes.

In our view, *Mason* and *Cruz*, which are not binding on this court, offer an insufficiently persuasive answer to the statutory analysis set forth above. *Mason* draws its conclusion without any analysis, simply citing *Cruz*. *See* 862 F.2d at 245. *Cruz*, while it recites Title 10 provisions as making presence on the Temporary Disability Retired List a kind of "interim status," ultimately rests on its treatment of the 1940 Relief Act as governed by its own distinct purposes and the need to construe that Act liberally for members of the armed services. 308 F. Supp. at 1055–56.[4] That rationale does not seem to us to give sufficient weight to the natural meaning of the "absent from duty" clause, given its language and setting, or to the provisions of Title 10 that make clear that the duty to serve ends for a service member placed on the List.

Our conclusion is not changed by the fact that Congress comprehensively amended the 1940 Act in 2003, after *Cruz* and *Mason* were handed down. It made some changes in section 511, such as adding an express reference to Title 10, *see* note 4, *supra*, but it carried forward

---

[4]   "[T]he definitions of Title 10 which are not, by their terms, applicable to the Relief Act, cannot be dispositive here. The provisions of Title 10 concern primarily the structure, manpower authorization and pay and retirement scale of the armed forces. The definitions in that title are constructed accordingly. Since the tolling provision of the Relief Act is contained in a different title which was enacted for the benefit of those in military service, the Act's definitions and purpose control." 308 F. Supp. at 1055 (footnote omitted).

The 1940 Relief Act version of section 511 that was applied in *Cruz* did not contain the express reference to Title 10 that is part of the current provision, which refers to "active duty, as defined in section 101(d)(1) of title 10." 50 U.S.C. app. § 511(2)(A)(i).

the "absent from duty" clause. Sometimes reenactment without relevant change has been understood to incorporate settled judicial interpretations. *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 589–90 (2010) ("We have often observed that when 'judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well.'") (citations omitted). We do not believe, however, that there is a sufficient basis for drawing such a conclusion here, even aside from the changes made in 2003.

"Settled" is not justified as a characterization of pre-2003 determinations of how the "absent from duty" clause applies to Temporary Disability Retired List status. *Cruz* and *Mason* are too small a foundation for that characterization, especially in light of the treatment of Temporary Disability Retired List status in other precedents, as discussed above. Moreover, while the 2003 House Report 108–81 cites a large number of judicial decisions in its descriptions of existing standards, reflecting the scope of the recodification effort, the report mentions neither *Cruz* nor *Mason* nor the conclusion they reached; nor does anything else from the legislative history we have seen. In these circumstances, we do not see a basis in the pre-2003 judicial decisions, or in the legislative history generally, for overcoming our inference about the fairest reading of section 511 as applied to a person placed on the Temporary Disability Retired List.

For the foregoing reasons, we conclude that all of Commander Cronin's claims except her claim alleging

post-traumatic stress disorder were untimely and thus must be dismissed for lack of jurisdiction.[5]

### B. Commander Cronin's PTSD Claims

There is no timeliness issue as to Commander Cronin's claims based on post-traumatic stress disorder. Evidently the government accepts that the claims based on PTSD accrued sufficiently late that the 2006 assertion of those claims was timely without need for a tolling of the limitations period by the 2003 Relief Act.

Commander Cronin challenges her disability rating with respect to PTSD. She argues that the Navy ignored evidence of her PTSD condition, failed to recognize that the evoking stressors occurred before she was placed on the Temporary Disability Retired List, and failed to recognize that the Physical Evaluation Board itself acknowledged in 2000 that she suffered from PTSD and, at least in part, compensated her for her PTSD. She also argues that her PTSD worsened her migraines and chronic pain and other conditions.

The legal background for consideration of Commander Cronin's claims includes the Veterans Affairs Schedule for Ratings Disability ("VASRD") established by the Department of Veterans Affairs as the standard for assigning percentage ratings for disabilities. U.S. Dep't of Navy, Sec'y of the Navy Instr. 1850.4E ("DES") § 3801(b). "The percentage ratings represent, as far as can practically be determined, the average impairment in civilian occupational earning capacity resulting from certain diseases

---

[5]     Although we conclude that the Trial Court lacked jurisdiction over the non-PTSD claims, we note that, having reviewed the Trial Court's rulings on the merits of those claims, we see no error in those rulings, for the reasons laid out by Judge Linn in his discussion of the merits of those claims.

and injuries, and their residual conditions." *Id.* But there are "differences between military department and DVA applications of rating policies for specific cases, [and] differences in ratings may result." DES § 3802(a). Importantly, the mere presence of a VASRD-rated condition is not sufficient to justify a disability rating from the Navy because "[c]onditions that do not themselves render a service member Unfit for military service will not be considered for determining the compensable disability rating unless those conditions contribute to the finding of unfitness." DES § 3802(g).

Accordingly, Physical Evaluation Board findings regarding disabilities are arranged in three categories: unfitting conditions (category I); conditions that contribute to unfitting conditions (category II); and conditions that are not separately unfitting and do not contribute to the unfitting condition (category III). DES § 4111. Only conditions in categories I and II receive a rating. *Id.* Further, DES § 3804(k) provides that "[a] member may be determined Unfit as a result of the overall effect of two or more impairments even though each of them, standing alone, would not cause the member to be referred into the DES or found Unfit because of physical disability."

With respect to the Temporary Disability Retired List, DES § 3618 provides the procedure for rating conditions that were not found unfitting at the time the service member was placed on the List but that are identified while the service member is on the List. Specifically, the "new" condition is compensable if it is (a) unfitting and either (b) caused by the condition for which the service member was placed on the List (or directly related to its treatment) or (c) incurred while the member was entitled to basic pay and was "an unfitting disability at the time the member was placed on the TDRL." *Id.* Otherwise, even if the condition is traced back to the period of service, "such conditions shall be deemed unfitting due to the

natural progression of the condition and noncompensable . . . ." *Id.*

On May 31, 1996, when Commander Cronin was placed on to the Temporary Disability Retired List, none of the Navy's medical boards had evidence, or made any determination, that she was unfit for duty by virtue of PTSD. Evidence that she suffered from PTSD began to appear in 1998. *Opinion* at 58–59. Under the governing regulation, PTSD must be considered a new condition because it was not found to be an unfitting condition at the time she was placed on the List. DES § 3618. Such a condition is compensable only if it was caused by one of the conditions that was found to be unfitting at that time (or treatment of such a condition) or if it was separately an unfitting disability itself at that time.

Commander Cronin does not appear to argue to this court that her PTSD was caused by one of the conditions found to be unfitting at the time she was placed on the TDRL. In any event, when she previously argued that PTSD resulted from her bipolar disorder, the Board for Correction considered the argument and rejected it. Although a social worker considered her hospitalization for bipolar disorder in 1995 to be a factor contributing to the PTSD, numerous other medical professionals did not. *Opinion* at 60. Accordingly, the Board for Correction's decision is supported by substantial evidence.

Commander Cronin gives a detailed account of the egregious evoking stressors that may have contributed to the eventual PTSD diagnosis. None of the evidence, however, indicates that the PTSD condition was unfitting at the time she was placed on the List in 1996, which is the only other way her PTSD could be compensable under DES § 3618. Although it is possible that the medical professionals misdiagnosed her before May 31, 1996, the medical evidence even from 1998 and later demonstrates a lack of consensus with respect to a PTSD diagnosis.

*Opinion* at 59–61. Moreover, while the Board for Correction commented in 2004 that a 2000 Physical Evaluation Board rating of Commander Cronin's bipolar disorder stated that the disorder "likely" included some impairment "incident" to her diagnosed PTSD, this is not sufficient evidence that her PTSD was unfitting as of May 31, 1996. Accordingly, the Board for Correction's decision to deny compensability for the PTSD is supported by substantial evidence.

Commander Cronin relatedly argues that her PTSD has worsened her migraines, chronic pain, fibromyalgia, temperomandibular joint disorder, and carpal tunnel syndrome. This argument does not add anything to her basic PTSD argument. Those conditions were not found unfitting before May 31, 1996; indeed, all were either raised and rejected, or could have been raised but were not, by that time. Commander Cronin has shown nothing establishing that the Board for Correction committed reversible error, under our deferential standard of review, in not finding that the PTSD, either directly or through worsening of these other conditions, rendered her unfit for duty before she was placed on the Temporary Disability Retired List.

## IV. CONCLUSION

For the forgoing reasons, the decision of the Trial Court is affirmed respecting the PTSD claims but otherwise vacated, with the matter remanded so that the non-PTSD claims may be dismissed for lack of jurisdiction.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART**

Each party shall bear its own costs.

# United States Court of Appeals
# for the Federal Circuit

---

**JUDITH LOUISE CRONIN,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

---

2013-5061

---

Appeal from the United States Court of Federal Claims in No. 06-CV-0633, Senior Judge Eric G. Bruggink.

---

LINN, *Circuit Judge,* concurring in part and concurring in part in result.

I concur in the majority's determination of the PTSD claim, which is not affected by the timeliness issue. With respect to the remaining claims, I respectfully disagree with the majority's determination that they were time barred, but addressing the merits, concur in the result.

## I. DISCUSSION

### A. The Relief Act's Tolling Provision

The majority interprets the Relief Act in effect to distinguish between servicemembers suffering injuries expected to heal in a few months from servicemembers suffering potentially more serious injuries that could take

an indeterminate period of time to heal and warrant placement on the List. In the majority's view, the Relief Act protects only the former. The first stated purpose of the Relief Act is "to provide for, strengthen, and expedite the national defense through protection extended by this Act [said sections] to servicemembers of the United States to enable such persons to devote their entire energy to the defense needs of the Nation." 50 U.S.C. app. § 502(1). I find that neither the text of the Relief Act nor its legislative history provides any principled reason to make the distinctions the majority would make.

Statutory interpretation begins with the text of the statute. *Turtle Island Restoration Network v. Evans,* 284 F.3d 1282, 1291 (Fed. Cir. 2002), *cert. denied,* 538 U.S. 960, 123 S.Ct. 1748, 155 L.Ed.2d 511 (2003). The Relief Act's tolling provision excludes a servicemember's period of "military service" from "any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of the . . . United States by or against the servicemember . . . ." 50 U.S.C. app. § 526(a). The Relief Act's Section 511(2) provides four sub-definitions of "military service," including "active duty" as defined by 10 U.S.C. § 101(d)(1), "a call to active service" for a member of the National Guard under 32 U.S.C. § 502(f), and "active service" of commissioned officers of the Public Health Service or the National Oceanic and Atmospheric Administration. Section 511(2)(C), the fourth and final sub-definition, merely states that "military service" includes periods of an absence from the three prior listed "duties" on account of sickness, wounds, leave, or other lawful cause. A servicemember is placed on the List, and therefore authorized to be removed from active duty, as a result of a physical disability. 10 U.S.C. app. § 1202. Periodic medical exams are used to assess whether the service member should remain on the List. 10 U.S.C. app. § 1210(a)–(f). Because time spent on the List is an

absence from duty on account of sickness, wounds, or otherwise lawful cause, on its face, the Relief Act's tolling provisions apply.

The Navy's arguments to the contrary are not persuasive. The Navy first argues that "absent from duty on account of sickness, wounds, leave, or other lawful cause" under the Relief Act is best understood as the converse of "absence without leave" ("AWOL"). However, the defining characteristic of AWOL is leave *without authority*. 10 U.S.C. app. § 886. Placement on the List comes with authorization for the servicemember to be absent from duty. The Navy also contends that the "more natural and plain reading" of the statute is that "absent from duty on account of sickness, wounds, leave, or other lawful cause" refers to a temporary absence from a duty post without separating from active duty. Appellee's Br. 27–28. However, that ignores that fact that the statute's definition of "military service" includes not only "active duty" but *separately* also includes time "absent from duty on account of sickness, wounds, leave, or other lawful cause." 50 U.S.C. app. § 511(2)(C). This statute draws a distinction between time on active duty and time during which there is an absence of duty on account of sickness, wounds, leave, or other lawful cause; and *both* are considered to be military service.

The Navy next argues that time spent on the List is total separation from the military more akin to an absence *of* duty as with retirement as opposed to an absence *from* duty as contemplated by the Relief Act's definition of military service. The majority places great emphasis on the fact that servicemembers on the list must consent to reinstatement or reappointment in order to return to active duty. *Majority* at 9–10. While there is a degree of separation from the military when on the List, significant connections to the military nonetheless remain. For example, placement on the List provides active duty allowances for travel in connection with the requisite

medical examinations. 10 U.S.C. app. § 1210(g). Also, if the servicemember does consent to be "recalled to active duty" or reenlisted, the time spent on the List may count as years of service for purposes of future promotions. 10 U.S.C. app. § 1211(e). Although I recognize that to return to active duty, a servicemember on the List must be "reappointed" or "reenlist," under 10 U.S.C. app. § 1211(a), a servicemember is not actually discharged or retired *while on the List*. Discharge or retirement from military service occurs only if the servicemember's physical disability becomes permanent or the servicemember declines to return to duty when the disability abates. *See, e.g.*, 10 U.S.C. app. §§ 1210(c) (If it is "determined that the member's physical disability is of a permanent nature and stable and is at least 30 percent under the standard schedule of rating disabilities in use by the Department of Veterans Affairs at the time of the determination, his name shall be removed from the temporary disability retired list and he shall be retired under section 1201 or 1204 of this title . . . ."); 1210(f) ("(1) [i]f, as a result of a periodic examination . . . or upon a final determination . . . it is determined that the member is physically fit to perform the duties of his office, grade, rank, or rating, the Secretary shall (A) treat the member as provided in section 1211 of this title [for reappointment or reenlistment with the servicemember's consent]; or (B) discharge the member, retire the member, or transfer the member to the Fleet Reserve, Fleet Marine Corps Reserve, or inactive Reserve under any other law if, under that law, the member (i) applies for and qualifies for that retirement or transfer; or (ii) is required to be discharged, retired, or eliminated from an active status.").

The Navy argues that the Relief Act's tolling provision applies only to the "period of military service," which it contends ends upon release from activity duty. The Navy relies on *Diamond v. United States*, 344 F. 2d. 703, 706 (Ct. Cl. 1965) (holding that under the Relief Act's prede-

cessor, a service member's "release from active duty terminated his 'period of military service'") and *Lowe v. United States*, 79 Fed. Cl. 218, 225 (2007) (holding that, "[o]n plaintiff's release from active duty, the tolling provision of the [Relief Act] ceased to operate, and the six-year statutory period of limitations began to run"). The Navy further contends that receipt of Defense Department Form 214 ("DD-214") relieves a servicemember from active duty, and Cronin received that form when she was placed on the List. However, neither *Diamond* nor *Lowe* involved time on the List, which as discussed above defines "military service" as not only "active duty" but also separately as an absence from duty on account of sickness, wounds, leave, or other lawful cause. 50 U.S.C. app. § 511(2)(C). The argument that "TDRL is not active service," *Dambrava*, 466 F.3d at 1063, thus falls short. *See also Bradley*, 161 F.3d at 782 (concluding that time on the List "was not active duty" without addressing the Relief Act's tolling provision or whether time on the TDRL nonetheless would be "military service").

Likewise, the majority relies on Commander Cronin's receipt of DD-214 as evidence that Commander Cronin was not "absent from duty" once placed on the List. Majority at 10. However, while receipt of Form 214 may reflect that Commander Cronin's "active duty" ended when she was placed on the List, that does not answer the question of whether her "military service" had ended or whether she was absent from that duty on account of sickness, wounds, leave, or other lawful cause. The majority notes that no new DD-214 was issued when Commander Cronin was placed onto the Permanent Disability Retired List, but there is no contention that she resumed "active duty" such that a new DD-214 would have been appropriate. Nor is there any contention that receipt of DD-214 permanently retired or discharged Commander Cronin, which as discussed above would occur only at the conclusion of her time on the List.

Courts previously have recognized that time spent on the List is difficult to categorize, referring to the status as a "limbo status." *See Craft*, 544 F.2d at 476. Given that the state of limbo and the Supreme Court's repeated direction for the need to construe the act liberally in favor of the serviceman, *Le Maistre v. Leffers*, 333 U.S. 1, 68 S.Ct. 371, 92 L.Ed. 429 (1948); *Boone v. Lightner*, 319 U.S. 561, 575, 63 S.Ct. 1223, 87 L.Ed. 1587, *reh'g denied*, 320 U.S. 809, 64 S.Ct. 26, 88 L.Ed. 489 (1943), I would find that the Relief Act's tolling provision applies here.

The weight of authority concerning the tolling provision of the Relief Act's predecessor similarly supports the view that time on the List is military service under the Relief Act. The Relief Act is the 2003 recodification of the Soldiers' and Sailors' Civil Relief Act of 1940. 149 Cong. Rec. E14-02, E14. That act contained a similar tolling provision, in which "[t]he period of military service shall not be included in computing any period now or hereafter to be limited by any law for the bringing of any action by or again any person in military service . . . ." Act of October 17, 1940, ch. 888, 54 Stat. 1181. Applying that act, the Tenth Circuit concluded that "placement on the 'temporary disability retired list' constitutes 'absen[ce] from duty on account of sickness' under the Act . . . ." *Mason*, 862 F.2d at 245. A district court in the Southern District of New York reached the same conclusion. *See Cruz*, 308 F. Supp. at 1055–56. The Navy points out that neither case involved the United States as a party. The reasoning and conclusions reached are nonetheless informative. The majority discounts *Cruz* and *Mason* because they "rest" on the predecessor act's "own distinct purposes and the need to construe that Act liberally for members of the armed services." *Majority* at 13–14. However, *Cruz* concluded that the purpose of the predecessor act was to provide "protection of a serviceman who is unable to attend to his affairs, whether because he is stationed away from home in active service or is recov-

ering from injuries incurred while in such active service." *Cruz*, 308 F. Supp. at 1057. The stated purpose of the successor Relief Act hardly compels a different result. *See* 50 USC app. § 502(1) (The purpose of the Relief Act is "to provide for, strengthen, and expedite the national defense through protection extended by this Act [said sections] to servicemembers of the United States to enable such persons to devote their entire energy to the defense needs of the Nation.").

The majority supports its decision by referring to cases holding that time on the List is not "active service." *Majority* at 13. However, none of these cases addressed whether time on the List should be considered "*military service*" for purposes of the Relief Act, of which "active service" is only one aspect.

Finding the statutory language unambiguous, reviewing the legislative history is unnecessary. Moreover, I note that the legislative history, as often is the case, is largely inconclusive but recent history supports my conclusion. The Navy argues that historically, "[p]ersons absent from duty on account of sickness, wounds, or other lawful cause are considered as still on active duty." *O'Keefe v. United States*, 174 Ct. Cl. 537, 549 n.5 (Ct. Fed. Cl. 1966) (citing the military's 1944 Dictionary of U.S. Army Terms). Thus, it contends that Section 511(2)(C) must be understood in that light. The original version of 10 U.S.C. app. § 1211, enacted in 1956 reinforces the notion that historically, time on the List was not considered active duty and thus was not an absence on account of sickness, wounds, or other lawful cause. The original statute referred to officers on the List needing to be "recalled to active duty," 70A Stat. 96 (1956), suggesting that a servicemember on List was not already on active duty and therefore would not be considered as "absent from duty on account of sickness, wounds, or other lawful cause."

The current Relief Act, however, restructured the definition of "military service" and defines "active duty" separately from "any period during which a servicemember is absent from duty on account of sickness, wounds, leave, or other lawful cause." 50 U.S.C. app. § 511(2)(A)(i) and (C). The legislative history is silent as to why the drafters separated "active duty" from an absence on account of sickness, wounds, leave, or other lawful causes. Nonetheless, the statute clearly separates the two concepts. Thus time during a period under Section 511(2)(C) is now considered distinct from active duty but is still part of "military service" and thus falls within the Relief Act's tolling provision.

Indeed, when the predecessor act was recodified as the Relief Act, *Mason* and *Cruz* had been decided for fifteen years, and the Relief Act, which was the product of "more than 10 years" of preparation, was intended to be a "complete restatement" of its predecessor, "including a gathering of the relevant judicial interpretations and a measured casting aside of those few interpretations that do not comport with the author's understanding of the law's intent," 149 Cong. Rec. H3688-03, H3696. The "restatement" was necessary to, among other things, "incorporate over 60 years of case law . . ." since the predecessor act was enacted. H.R. Rep. 108-81. Though the record does not indicate Congress directly discussed *Mason* or *Cruz*, I find it inconceivable that Congress, specifically setting out to survey the case law, could have been unaware of these cases or that it would have restructured the definition of "military service" as it did if it believed that *Mason* and *Cruz* did not comport with the author's understanding of the law's intent. The majority concludes that *Mason* and *Cruz* did not "settle" the law regarding the application of the Relief Act's tolling provision to members on the List, "especially in light" of *Craft, Dambrava, Bradley*; and *Cortez*. *Majority* at 12–13, 15. However, while these cases considered "active duty" with

respect to the List, none assessed the full scope of "military service" with respect to the Relief Act and thus none are particularly germane to the specific issue presented here.

Finally, I note that while the Trial Court in this case correctly held that the Relief Act does toll the statute of limitations during the time spent on the List, a recent decision in a separate case reached the opposite conclusion. *See Dean*, 92 Fed. Cl. 133. I first observe that in *Dean*, the claim was filed more than six years after the veteran was removed from the List and permanently discharged from the military by reason of physical disability. *Id.* at 153. Accordingly, the Relief Act's tolling provision could not have salvaged his claim in any event. Moreover, though *Dean* thoughtfully surveyed the statutory framework and this court's precedent, I respectfully find the analysis unpersuasive. *Dean* correctly noted that under the statutory framework and this court's precedents, time on the List was not active service. *Id.* at 152–152. However, as discussed above, the Relief Act distinguishes between active duty and "any period during which a servicemember is absent from duty on account of sickness, wounds, leave, or other lawful cause." *Dean* "decline[d] to make a determination that a sickness, as noted in 50 U.S.C. appl. § 511(2)(C), rises to the level of a disability." *Id.* at 153. However, as discussed above, I conclude that under the statute's plain language, within the definition of 50 U.S.C. appl. § 511(2)(C) are sicknesses or wounds so severe as to rise to the level of a disability resulting in an absence from duty for a lawful cause, such as the List. A servicemember is not actually retired or discharged while on the List, events which occur only after the servicemember's disability recedes and the servicemember refuses to consent to return to active duty. Accordingly, a servicemember placed on the List because of a disability, though not on "active duty," continues to be

engaged in "military service" for purposes of the tolling provision.

For the foregoing reasons, I would hold that the Relief Act's tolling provision applies to time served on the List and would conclude that Cronin's claims are not time barred by the Tucker Act's six year statute of limitations.

B. Cronin's Promotion Claim

On the merits, I would affirm the Trial Court's determination that Cronin failed to demonstrate reversible error. Cronin's first claim is that she is owed backpay because she should have received, but illegally was denied, a promotion to Commander as of October 1, 1994.

Cronin contends that she was promoted to Commander automatically on October 1, 1994 without the need for any other action. She contends that October 1, 1994 was the date of her appointment and the Navy failed to follow the regulations that might have permitted a delay of that promotion. She argues further that because she was frocked as a Commander, she could not be denied promotion unless some restriction imposed by law allowed for that denial. *See* MILPERSMAN 2220130(5)(e) ("Frocked officers will be entitled to military identification cards and all privileges for the higher pay grade except entitlements restricted by law."). She concedes that SECNAVINST 1420.1A(23), a Navy regulation, outlines such a "restriction," allowing the Navy to delay a promotion but only if "[t]here is cause to believe that the officer is mentally, physically, morally, or professionally unqualified" and allowing that delay "only if the officer has been given written notice of the grounds for the delay before the effective date of the appointment, unless it is impractical to do so, in which case such written notice shall be given as soon as practicable." J.A. 265; *see also* 10 U.S.C. § 624(d)(2)–(3) (providing for the same and incorporated by MILPERSMAN 2220130(5)(b) for frocked officers). She contends that the Navy failed to follow SECNAVINST

1420.1A and 10 U.S.C. § 624(d)(2)–(3) because she was not given the required notice. She also points to her personnel file that in fact notes a promotion to Commander effective October 1, 1994 that later was struck through with a note that she was not promoted "as she was not physically qualified." J.A. 82.

The Navy responds that Cronin was not actually promoted because she did not receive the standard appointment form and the Navy announced the delay of her promotion before October 1, 1994 in accordance with the applicable regulations. The Navy further contends that it properly delayed Cronin's promotion because it had cause to believe that she was physically unqualified, which under the Navy's regulations allows for a delay of promotion. The Navy finally asserts that to the extent regulations were not strictly followed, the error was harmless.

Cronin's arguments are unpersuasive. The Navy gave Cronin the required notice of a delay in her promotion in the form of a letter dated September 30, 1994. The letter informed Cronin that her promotion would be delayed because she was not fit for duty. *See* J.A. 88; *Opinion* at 42. Cronin contends that this letter must have been backdated from at least October 5, 1994 (and thus after her promotion was to occur) because the letter refers to a Medical Evaluation Board ("MEB") report that did not issue until October 5, 1994. The Trial Court "declined to presume falsification of the September 30 date" and "presume[d] that the Chief of Naval Personnel saw an earlier version of the medical board report." *Id*. This finding is not clearly erroneous. *See Richey v. United States*, 322 F.3d 1317, 1326–27 (Fed. Cir. 2003) (The plaintiff in military records correction case must "overcome the presumption of regularity that attaches to all administrative decisions . . . .").

Cronin next contends that the letter was ineffective regardless of the date because she did not receive it before

the effective date of her promotion. However, even assuming the regulation requires Cronin to actually receive the written notice before the effective date, Cronin was provided a full opportunity to respond to the letter, so any procedural error as to the date she received it, and thus with respect to SECNAVIST 1420.1A and 10 U.S.C. § 624(d)(2)–(3), was harmless. *Barnes v. United States*, 473 F.3d 1356, 1363 (Fed. Cir. 2007) (finding any procedural defect with respect to notice of a promotion delay to be harmless when the serviceman was provided an opportunity to respond and no action or decision is made against him in the interim).

Lastly, though her personnel record at one point indicated the promotion had occurred, the Trial Court noted that Cronin never received or executed an appointment form regarding the actual promotion, a form that she had received and executed in connection with all previous promotions and that "normally" carries the "authority to effect promotion." *Opinion* at 45 (quoting the announcement of the promotion list bearing Cronin's name). For these reasons, I cannot conclude that the Board's determination that Cronin was not actually promoted to commander on October 1, 1994 was clearly erroneous, arbitrary and capricious, unsupported by substantial evidence, or otherwise not in accordance with the law.

Cronin next attacks the basis on which the promotion was delayed, but that attack also fails. SECNAVINST 1420.1A(23)(a)(5) allows for delay if "[t]here is cause to believe that the officer is mentally, physically, morally, or professionally unqualified." MEBs in 1993 and 1994 found Cronin was unfit for full duty and recommended limited duty assignments. J.A. 128. The last period of limited duty recommended by the MEB was set to expire on September 12, 1994—before the October 1, 1994 promotion. However, a Navy physician in a letter in August 1994 again opined that Cronin was not fit for full duty. *Opinion* at 3.

Cronin's argument relies on MILPERSMAN 2220150(2), which provides that an officer "shall be considered physically qualified provided the officer is not in one of the following situations:

a. Undergoing hospitalization.

b. On sick leave.

c. Awaiting appearance before a physical evaluation board.

d. Classified as fit for limited duty based on the recommendations of a medical board.

e. Awaiting final action on the recommended findings of a physical evaluation board or a medical board."

She contends that none of those conditions applied as of October 1, 1994 and that therefore the Navy must consider her physically qualified. However, MILPERSMAN 2220150(1) provides that the reference point of the officer's physical qualification is "as reflected by the officer's most recent physical examination," and MILPERSMAN 2220150(2) further provides that the enumerated list above also is "[s]ubject to any further review of the records in the Navy Department which may be indicated and action resulting from that review . . . ." The report of the MEB in April 1994 and the August 1994 letter from a Navy physician fully support the Navy's actions and are in accordance with MILPERSMAN 2220150(1) and (2).

Cronin next points to MILPERSMAN 2220150(3) which provides that:

The foregoing criteria [from MILPERSMAN 2220150(2)(a)–(e)] may not exclude from promotion an officer who, if otherwise eligible, is determined to be not physically qualified for promotion when the Chief, Bureau of Medicine and Surgery determines that the officer's physical disqualifica-

tion was by reason of wounds received in the line of duty and that such wounds do not incapacitate the officer for the performance of useful service in the higher grade.

However, it is undisputed that the Chief, Bureau of Medicine and Surgery made no such determination.

Cronin also argues that the Navy failed to follow its regulations with respect to the length of time for the delay. SECNAVINST 1420.1A(23)(d) initially allows a delay of six months, which can be extended. There is no dispute that a formal request for a permissible extension was made, *Opinion* at 12, but Cronin contends that there is no indication as to whether the request was approved or disapproved. The Board determined that the request was approved, and given that the delay in fact continued, that finding is not clearly erroneous. *Kaneko v. United States*, 122 F.3d 1048, 1053–54 (Fed. Cir. 1997) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly errone-ous.")

Cronin similarly argues that the Navy failed to follow its own regulations when it delayed her promotion beyond 18 months, the absolute limit allowed by SECNAVINST 1420.1A(23)(d). Cronin was set to be promoted on October 1, 1994. Within the statutory 18-month period, the Navy took action to end the delay of her promotion by issuing her formal TDRL order placing her on the List and simul-taneously promoting her to Commander as of May 31, 1996. J.A. 139. The Trial Court concluded that the retirement order was effective as the "last possible action the Navy could take with respect" to Cronin's promotion. *Opinion* at 47. I see no clear error in that determination and find no basis to conclude that the Navy's actions were contrary to the provisions of SECNAVINST 1420.1A(23)(d).

## C.  Cronin's Disability Rating Claim

Cronin separately challenges her disability rating. Specifically, she challenges her ratings with respect to migraines, her right heel injury, and chronic pain.  Regarding migraines, she argues that they should have been found unfitting before she was placed on the List and that the Navy ignored the rating under the Veterans Affairs Schedule for Ratings Disability ("VASRD") for the migraines from which she suffered.  Regarding her right heel injury, she contends that the Navy ignored the record evidence, instead substituting its own lay opinion.  She lastly contends that the Navy generally failed to consider her medical records and their descriptions of her conditions, instead substituting its own opinions.

### 1.  Migraines

There is no dispute that Cronin suffered migraines at the time she was placed on the List.  Cronin therefore contends that under the VASRD, the migraines should have been rated at 30%.  *See* 38 C.F.R. § 4.124(a).  However, at the time she was placed on the TDLR, her migraines were assigned to category III as not separately unfitting and not contributing to any unfitting condition. Based on evidence in the record, the PEB and the Board found that the migraines were not unfitting because they appeared to be well controlled with medication and treatment. *Opinion* at 53–54.  There is sufficient evidence in the record to support the decision that the migraines were not unfitting and therefore not ratable.

### 2.  Right-Heel Injury

Cronin's right-heel injury was considered unfitting and compensable at the time Cronin was placed on the List.  *Id.* at 52.  Subsequently, a physician determined prior to the 2000 Physical Evaluation Board that Cronin's right heel had full range of motion and "minimal tenderness to palpation" and re-diagnosed the injury from a

calcaneal spur to calcaneal pain. *Id.* The 2000 Physical Evaluation Board observed Cronin in heeled sandals rather than orthopedic footwear, and based on its own observation and the recent physician's report reduced the rating from 30% to 0%, though still finding the condition to be unfitting. *See* DES § 3804(l)(1) ("[o]ccasionally, a medical condition that causes or contributes to Unfitness for military service is of such mild degree that it does not meet the criteria for even the lowest rating provided in the VASRD [and a] zero percent rating may be applied . . . ."). Cronin protests the Physical Evaluation Board and subsequent Board decisions for basing the rating on their own "subjective opinions," but the physician's report of full range of motion and only minimal tenderness provides substantial evidence to support the Board's decision.

### 3. Chronic Pain

Cronin argues that her chronic pain is a "'new condition' related to the treatment of other conditions for which she was placed on the TDRL . . . ." Appellant's Br. 5. To be compensable, the condition must itself be unfitting, DES § 3618, and Cronin merely points to evidence that she receives treatment for chronic pain rather than developing sufficient argument or pointing to sufficient evidence here capable of demonstrating that her chronic pain is unfitting.

Related to her chronic pain claim, Cronin argues that the Board erred by refusing to adequately consider whether multiple conditions, each not unfitting in isolation, together should be considered unfitting in combination, including her complaints of migraines, chronic pain, fibromyalgia, TMJ, and carpal tunnel syndrome. DES § 3804(k) provides that a "member may be determined Unfit as a result of the overall effect of two or more impairments even though each of them, standing alone, would not cause the member to be referred into the DES

or be found Unfit because of physical disability." However, fibromyalgia and TMJ are new conditions relative to when Cronin was placed on the List, and Cronin has not demonstrated that they could satisfy the conditions of DES § 3618. The conditions do not appear related to a condition unfitting at the time she was placed on the List—or its treatment—or are themselves conditions that were unfitting at the time she was placed on the List. Without either showing, the conditions could not be compensable the first instance. Cronin did complain of migraines and carpal tunnel syndrome at the original 1995 PEB, and as discussed above she contends that her chronic pain is related to her unfitting conditions, but she raises no argument as to how these conditions when considered together somehow render her unfit when separately they do not. Even if the statute allows for what Cronin argues, on this record I cannot conclude that the Board's conclusion lacks substantial evidence or was arbitrary and capricious.

Finally, Cronin makes a global argument that the Navy must have failed to consider all of the evidence when it decided against her. Though I find that the record reflects that Cronin unfortunately suffers from numerous ailments, for the reasons described above, the record also provides substantial evidence to support the Board's conclusions that her PTSD, migraines, right-heel injury, and chronic pain are non-compensable under the DES despite the fact that Cronin may suffer from them.

## II. Conclusion

For the foregoing reasons, while I concur in the majority's determination of the PTSD claim and concur in the majority's disposition of the remaining claims, I would reach that result on the merits of all of the issues on appeal.